

823 P.2d 1365  Page 1
823 P.2d 1365
**(Cite as: 823 P.2d 1365)**

🚩

**Briefs and Other Related Documents**

Supreme Court of Colorado,
En Banc.
BLUEWATER INSURANCE LIMITED (by
TENNESSEE INSURANCE COMPANY, as its successor
in interest);  Camelback Reinsurance Underwriter,
Inc., on behalf of Imperial
Casualty and Indemnity Company;  First Horizon
Insurance Co. and American
Centennial Insurance Company, Petitioners,
v.
Robert D. BALZANO (by Daniel J. COLAIANNIA,
as his successor in interest),
Special Deputy Commissioner of Insurance of
Colorado and Receiver in
Liquidation of Aspen Indemnity Corporation and
A.I.C., Agency, Inc.,
Respondent.
**No. 90SC417.**

Jan. 13, 1992.
As Modified on Denial of Rehearing Feb. 24, 1992.

Commissioner of Insurance, as receiver in liquidation of insolvent primary insurer, filed declaratory judgment action against reinsurers requesting determination of amount of reinsurance proceeds due.  The District Court, City and County of Denver, Daniel B. Sparr, J., granted Commissioner's motion for summary judgment.  Reinsurers appealed.  The Court of Appeals, 801 P.2d 1, affirmed.  Reinsurers petitioned for certiorari.  The Supreme Court, Mullarkey, J., held that:  (1) Commissioner of Insurance had power to regulate reinsurance contracts by excluding from those contracts offset clauses pursuant to which reinsurers had right to offset unpaid premiums for proceeds due for reinsured losses;  (2) reinsurers, having freely entered into contracts from which offset clause was deliberately excluded by Commissioner, were bound by contracts;  (3) insurance liquidation act was not intended to preserve equitable right to offset, and full amount of reinsurance proceeds due was general asset to be collected and distributed according to order of priorities provided in act;  and (4) reinsurers held full amount of reinsurance liability credits in fiduciary capacity, and thus, under common law, equity required that full amount of proceeds from reinsurance be due and payable to receiver for benefit of insureds and could not be offset by unpaid premiums.

Affirmed.

West Headnotes

**[1] Insurance** 🗝 1034
217k1034 Most Cited Cases
    (Formerly 217k11.1)
Commissioner of Insurance had power to regulate reinsurance contracts by specifically disapproving any proposed term preserving right to offset and by modifying contracts accordingly.  West's C.R.S.A. § § 10-1-109, 10-3- 118(4), (4)(b, c), 10-3-702(4).

**[2] Insurance** 🗝 3616
217k3616 Most Cited Cases
    (Formerly 217k684)
Reinsurers' contracts from which offset clause was deliberately excluded were enforceable and binding on reinsurers, even assuming that reinsurers had common law or equitable right to offset in context of reinsurance contract, where reinsurers assented to contracts even after offset term was expressly disapproved by Commissioner of Insurance.  West's C.R.S.A. § 10-3-702(2).

**[3] Insurance** 🗝 1363
217k1363 Most Cited Cases
    (Formerly 217k684)
Insurance liquidation act was not intended to preserve equitable right to offset, and full amount of reinsurance proceeds due to insolvent insurer was general asset to be collected and distributed according to order of priorities
provided in liquidation act.  West's C.R.S.A. § 10-3-507(3), (3)(d).

**[4] Insurance** 🗝 1373
217k1373 Most Cited Cases
    (Formerly 217k684)

**[4] Insurance** 🗝 3616
217k3616 Most Cited Cases
    (Formerly 217k684)
Reinsurers held full amount of reinsurance liability credits in fiduciary capacity, and thus, under common

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law, obligation to pay proceeds due under reinsured policies could not be diminished by debts, i.e., unpaid premiums, owed by insolvent insurer, and equity required that full amount of proceeds from reinsurance be due and payable to receiver for benefit of insureds.

**\*1366** Joseph J. Bronesky, F. Brittin Clayton, III, Sherman & Howard, Denver, for petitioners.

Thomas Frank, Frank & Finger, Evergreen, for respondent.

Alan Epstein, Hall & Evans, Denver, for amici curiae.

Richard E. Barnsback, Phillip E. Stano, David M. Leifer, Washington, D.C., for American Council of Life Ins.

Jack Blaine, Robert Sarber, Washington D.C., for Reinsurance Ass'n of America.

Craig A. Berrington, Ronald S. Gass, Washington, D.C., for American Ins. Ass'n.

Richard E. Goodman, Schaumburg, Ill., for Alliance of American Insurers.

John J. Nangle, Des Plaines, Ill., for National Ass'n of Independent Insurers.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the decision of the court of appeals in Balzano v. Bluewater Ins. Ltd., 801 P.2d 1 (Colo.App.1990). The court of appeals affirmed summary judgment and held that the relevant Colorado statutes require a reinsurer to pay in full the policy liabilities of an insolvent ceding insurer without diminution, thus abrogating any right of the reinsurer to offset unpaid premiums from the reinsurance proceeds due. We affirm.

I.

To properly approach this case, a basic understanding of the business of reinsurance is required. Before introducing the **\*1367** parties and presenting the factual background of this case, we first summarize the relevant general features of reinsurance. In addition, we remark on whether the business of reinsurance in Colorado adheres to or departs from these general features.

A.

Obviously, reinsurance is predicated on the existence of insurance, which "serves to protect individuals against financial calamity." [FN1] With insurance purchased from a primary insurer, individuals and businesses (the "policyholders" or "insureds") receive compensation for losses incurred. Basically, reinsurance is a contract between a primary insurer and another insurance company where the former is indemnified by the latter for losses on paid claims to policyholders. The indemnitor is called the reinsurer. With such a contract, the primary insurer is reinsured.

> FN1. *See* Wetzel Services, Inc. v. Johnson, 821 P.2d 804, 809 (Colo.1991).

The contract is formed when the primary insurer "cedes" a portion of the premiums for its policies and the losses on those policies to the reinsurer. Policyholders pay premiums to their primary insurer, and that insurer, as the reinsured, in turn pays to the reinsurer a certain percentage of those premiums as consideration. Since the reinsurer does not incur the normal costs of writing primary insurance, such as administrative expenses and commissions paid to agents, the reinsurer can profitably reinsure the risks for only a percentage of the premiums paid to the primary insurer. If the primary insurer has to compensate its policyholders for losses, the reinsurer in turn indemnifies the primary insurer. [FN2] The advantage of this general feature of reinsurance is to secure to the primary insurer "adequate risk distribution by transferring part of the risk to another insurer or group of insurers." [FN3]

> FN2. *See generally* T. Darrington Semple, Jr., and Robert M. Hall, *The Reinsurer's Liability in the Event of the Insolvency of a Ceding Property and Casualty Insurer,* 21 Tort & Insurance L.J. 407 (1986) ("A reinsurance agreement is one by which the reinsurer indemnifies the ceding company for losses paid."). We note that at least at the time of this article's publication, both authors were counsel for the American Reinsurance Company in New York, N.Y.

> FN3. Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 1.3(b)(2) (1988).

A second advantage of reinsurance is that it enables a primary insurer to reduce the amount of reserves usually required by law for the protection of the policyholding public. [FN4] The advantage to the insurer is an increased ability to underwrite additional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

policies and/or to make other types of investments. From the perspective of the insurance industry, contracting for reinsurance permits an insurer, typically a small insurer, simultaneously to lessen its exposure to catastrophic loss and to increase its capital available for investment.

> FN4. *See* James Robert Olsen, *Reinsurers' Liability To The Insolvent Reinsured,* 41 Notre Dame Lawyer 13, 15 (1965).

In Colorado and in most if not all states, the insurance business is regulated by fairly comprehensive insurance codes. The Colorado insurance code, Title 10, 4A C.R.S. (1987), which is enforced by the state insurance commissioner (the "commissioner"), reflects more or less the general features and attendant advantages of reinsurance summarized above. Thus, under the specific statute regulating the reinsurance business, a qualified primary insurer may "reinsure all or part of an insurance risk in any other insurer" and "take credit for reserves on risks ceded to a reinsurer." § 10-3-118(1) and (3)(a), 4A C.R.S. (1987).

Reinsurance has certain advantages which accrue to the insured public as well, at least under the Colorado insurance code as enforced by the commissioner. As supervised by the commissioner, reinsurance coverage represents an added shield protecting a policyholder against uncompensated loss. This advantage to the insureds is realized most obviously in the event of the primary insurer's insolvency, an event which precipitated the dispute in this case. Thus, from the perspective of an insured or policyholder, the insolvency of the primary **\*1368** insurer may make any reinsurance the only or *de facto* source of at least partial compensation for losses incurred. Since the Colorado insurance code allows the reinsured primary insurer to take credit for statutory reserves, which reserves are required for the protection of the public, it is not surprising that reinsurance contracts are treated and regulated by the commissioner with a view to the public interest.

As noted, reinsurance generally is considered an indemnity contract between the primary insurer and the reinsurer. This means that the "reinsurer does not assume the liability of the ceding company" and that the insured or policyholder is not a third-party beneficiary of a reinsurance contract with the right to sue. [FN5] However, because the public interest is implicated in reinsurance contracts, in Colorado such contracts may not be considered pure indemnity contracts, as we shall see in part II.

> FN5. *See* Semple & Hall, *supra* note 2, at 407, 415-16.

There is a third general feature of reinsurance, the presence or absence of which does affect the public interest in cases of the insolvency of the primary insurer. This feature is the practice of "offsetting" balances due between the primary insurer and the reinsurer and is at the center of the dispute in this case. Apparently, "[m]ost reinsurance agreements contain an offset clause which allows either party to the agreement to net credits against debits and pay only the balance." [FN6] Under an offset clause, reinsurers and ceding insurers maintain a periodic account which involves numerous credits and debits reflecting various payables and recoverables. The advantage of an offset clause to a primary insurer is that the primary insurer "can obtain the reinsurance recoverables immediately (and improve its liquidity) by netting them against premiums otherwise due the reinsurer." [FN7] As we shall discuss in part II of this opinion, the manner in which the reinsurance business as regulated in Colorado either adheres to, or departs from, this practice of netting debits against credits even after the insolvency of the primary insurer presents the broad problem in this case.

> FN6. Semple & Hall, *supra* note 2, at 419. For a typical offset clause, *see id,* n. 49.

> FN7. *Id.* at 420.

B.

Petitioners, including the Tennessee Insurance Company, the successor in interest to Bluewater Insurance Ltd. (the "reinsurers"), are a group of insurance companies in the business of providing reinsurance coverage. The reinsurers, in a series of contracts which included the so-called Non-Caterpillar Dealer Business Reinsurance Treaty and the Master Excess of Loss Reinsurance Agreements (the "contracts"), provided reinsurance coverage to the Aspen Indemnity Corporation ("Aspen"), a primary insurer licensed in Colorado. As consideration, Aspen agreed to pay a certain percentage of its premiums to the reinsurers in quarterly installments which were payable in advance.

Initially, Aspen issued primary coverage to independent franchised Caterpillar dealerships, including their workers' compensation plans. Aspen expanded in 1979 and began to write primary fire, property and casualty coverage. According to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reinsurance contracts, the reinsurers were committed to indemnify Aspen for claims or losses incurred by those holding policies written by Aspen. The contracts also provided that, in the event of insolvency, the reinsurance would be payable to the receiver on the basis of the liability of Aspen without diminution because of the insolvency of Aspen. As required by statute, these contracts were submitted to the commissioner for his approval.

Evidently, even in the absence of a contractual offset clause of the type described above, the reinsurers and Aspen nevertheless maintained an account which netted credits and debits reflecting various payables and recoverables. As noted, the contracts provided that the premiums were to **\*1369** be paid to the reinsurers in advance. The accounts between the reinsurers and Aspen were not prudently managed because Aspen failed to pay, for at least five consecutive quarters, premiums ceded to the reinsurers under the reinsurance contracts. It was established at oral argument that upon Aspen's failure to pay the premiums, the reinsurers could have terminated the contracts after due notice to the commissioner. The reinsurers did not give notice to the commissioner of Aspen's nonpayment of premiums for five quarters and/or of an intent to terminate the reinsurance contracts with Aspen.

In 1984, the commissioner determined that Aspen was insolvent and liquidation proceedings were initiated under the Uniform Insurers Liquidation Act, § 10- 3-501, *et seq.,* 4A C.R.S. (1987) (the "liquidation act"). Respondent in this case, the deputy commissioner of insurance and Aspen's appointed receiver (the "receiver"), brought suit in the district court for a declaration of the reinsurers' obligations under the contracts and for more than $450,000 to compensate losses incurred by policyholders who were not compensated by Aspen prior to Aspen's liquidation. Cross-motions for summary judgment were filed, with the receiver seeking the full amount of the proceeds due under the contracts and the reinsurers seeking to exercise an alleged equitable right to offset the unpaid premiums from the proceeds due. The trial court granted the receiver's motion and the court of appeals affirmed, holding that such offsets cannot be exercised once a ceding insurer is in receivership, and that if allowed such offsets would create a preference for the reinsurers contrary to the liquidation act.

II.

We granted certiorari on two issues: whether the reinsurers have an equitable right, unaffected by section 10-3-118(4)(b), 4A C.R.S. (1987), to offset unpaid insurance premiums against reinsurance proceeds due under contracts with the primary insurer, and whether that equitable right to offset, if not abrogated, would create a preference contrary to the order of distribution provided in the liquidation act.

The real issue before us, however, concerns the power of the commissioner under the insurance code to regulate the terms and conditions of the contracts between the reinsurers and Aspen. This case turns on whether the commissioner has the power to regulate reinsurance contracts by excluding from those contracts an offset clause pursuant to which the reinsurers have the right to offset unpaid premiums from proceeds due for reinsured losses. It is undisputed that the commissioner exercised such power in this case: at the commissioner's directive, the reinsurance contracts at issue here excluded the right-to-offset clause. The reinsurers nonetheless entered the contracts.

Even if the reinsurers otherwise enjoyed an equitable right to offset, nothing prevented the reinsurers from freely entering into enforceable contracts from which an offset clause was deliberately excluded. Having entered into such contracts, the reinsurers are bound. Thus we conclude that the trial court and the court of appeals correctly rejected the reinsurers' arguments and enforced the contracts of reinsurance.

The analysis in this part II begins by setting forth, in subpart A, the controlling statutes from Colorado's insurance code. We discuss the statutes in subpart B and conclude that the commissioner has ample power under a constellation of provisions in the insurance code, not just subsection 10-3- 118(4)(b), to prohibit the right to offset in reinsurance contracts. We then proceed to review the relevant features of the negotiating history of the contracts in subpart C. From this undisputed history, we conclude that the expectations of the reinsurers were that the right to offset was not a term of the contracts. In subpart D, we consider and reject the reinsurers' argument that the insurance liquidation act was intended to preserve an equitable right to offset.

A.

The controlling statutes, all from the Colorado insurance code, Title 10, 4A C.R.S. (1987), provide in relevant part:

**\*1370 10-3-118. Reinsurance--conditions--effect on reserves.** (1) Any insurance company authorized to do business in this state, referred to in

this section as the "ceding insurer", may, subject to the provisions of part 7 of this article, reinsure all or part of an insurance risk in any other insurer, referred to in this section as the "reinsurer".

(2) Complete copies of all reinsurance treaties and contracts and other information desired shall be filed with the commissioner pursuant to regulation or at his request.

(3)(a) A ceding insurer may take credit for reserves on risks ceded to a reinsurer ....

. . . . .

(4) No credit shall be allowed, as an asset or a deduction from liability, to any ceding insurer for reinsurance:

. . . . .

(b) Unless the reinsurance is payable by the reinsurer while in force on the basis of the contractual liability of the ceding insurer under the contracts reinsured without diminution due to the insolvency of the ceding insurer; or

(c) Where the reinsurance contract does not result in the absolute transfer to the reinsurer of risk or liability; ....

\* \* \* \* \* \*

**10-3-702. Procedure.** (1) Any domestic insurer proposing to reinsure all or a substantial portion of the risks of any other insurer and any domestic or foreign insurer proposing to have all or a substantial portion of its risks on policies issued in this state or covering risks or property located in this state reinsured shall file a petition for approval with the commissioner.

(2) Such petition shall contain all the terms and conditions of the proposed transaction.

. . . . .

(4) The commissioner may approve or disapprove the petition submitted, or he may approve it with such modifications as he deems to be in the best interests of policyholders and the public.

\* \* \* \* \* \*

**10-3-709. Construction with other laws.** The provisions of this part 7 are supplementary to the provisions of section 10-3-118.

\* \* \* \* \* \*

**10-3-507. Priority of preferred claims.**

. . . . .

(3) In a delinquency proceeding against an insurer for which a receiver has been appointed in this state, the priorities of distribution of general assets shall be as follows:

(a) The administration expenses of the receiver;

(b) Wages and commissions actually owing to employees for services rendered ...;

(c) Claims by policyholders, beneficiaries, and insureds ...;

(d) All other claims not falling within any other priority under this section.

\* \* \* \* \* \*

**10-3-502. Definitions.**...

(5) "General assets" means all property, real, personal, or otherwise, not specifically mortgaged, pledged, deposited, or otherwise encumbered for the security or benefit of specified persons or a limited class of persons, and as to such specifically encumbered property the term includes all such property or its proceeds in excess of the amount necessary to discharge the sum secured thereby. Assets held in trust and assets held on deposit for the security or benefit of all policyholders or all policyholders and creditors in the United States shall be deemed general assets.

\* \* \* \* \* \*

**10-1-109. Rules and regulations of commissioner.** The commissioner may establish, and from time to time amend, such reasonable rules and regulations as are necessary to enable him to carry out his duties under the laws of the state of Colorado.

**\*1371** By the authority of these statutes which comprise Colorado's insurance code, the commissioner regulates and supervises the business of insurance, including reinsurance. In addition, section 10-1-108(8), 4A C.R.S. (1987), provides that "[i]t is the duty and responsibility of the commissioner to supervise the business of insurance in this state to assure that it is conducted in accordance with the laws of this state and in such manner as to protect policyholders and the general public."

B.

[1] Reviewing the statutes cited above, we find that the commissioner has the general power to supervise reinsurance contracts in the public interest. The power to disapprove reinsurance contracts or to modify them before approval is expressly granted to the commissioner by section 10-3-702(4). The commissioner's power to make regulations is expressly granted by section 10- 1-109. The question then is whether the commissioner has the

823 P.2d 1365                                                                                                                Page 6
823 P.2d 1365
**(Cite as: 823 P.2d 1365)**

power to regulate reinsurance contracts by particularly prohibiting the right to offset unremitted premiums from the amount of proceeds due on reinsured policies.

The reinsurers argue that the commissioner has misread subsection 10-3-118(4)(b), which provides that, if an insurer is to take credit for reserves on risks ceded to a reinsurer, the reinsurance must be payable "without diminution due to the insolvency of the ceding insurer." This is the so-called "insolvency clause." The reinsurers argue that the intent of the insolvency clause was not to abrogate the equitable right to offset but simply to overcome *Fidelity & Deposit Co. v. Pink,* 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937).

In *Pink,* the Supreme Court determined that reinsurance was a contract of indemnity rather than liability, a holding which resulted in windfalls for reinsurers in cases of insolvency. *See Benham v. Pryke,* 744 P.2d 67, 71 (Colo.1987). Under *Pink,* a reinsurer must indemnify a ceding insurer only for payments which in fact were made by a ceding insurer to an insured for claimed losses. Any protection afforded by reinsurance to the insureds or policyholders, thus, was easily defeated by the insolvency of the primary insurer. Payments not made were not indemnified.

The immediate impetus to add insolvency clauses to insurance codes in many jurisdictions was to correct the *Pink* anomaly. According to the reinsurers, this was also the case in Colorado. In their view, the insolvency clause was not intended to abrogate the common law or equitable right to offset the amount of unpaid premiums. An offset, say the reinsurers, is in no way a "diminution due to" the insolvency of Aspen. The reinsurers contend, rather, that the case now before us concerns mutual debts which could be offset regardless of whether Aspen suffered insolvency or did not suffer insolvency.

In response, the receiver argues that there is no common law right to offset in the reinsurance context. Even if such a right does exist at common law, the receiver argues, the insolvency clause abrogates the alleged right because an offset would be antithetical to the general intent of the insurance code. The commissioner has construed the insolvency clause not only to thwart the kind of windfall sanctioned by *Pink,* but also to foil the associated evil of the abuse of the statutorily granted credit for reserves which looms in cases of insolvency.

The credit, as we explained earlier, affords a primary insurer added capital to make additional investments. The credit, however, is granted only because the reinsurance makes up the difference, maintaining the reserve at a prescribed minimum. If offsets were permitted, contends the receiver, the quid pro quo would be destroyed. We agree. The contracts provided that the premiums be paid in advance. The practical effect of this provision is to obviate the need to net or offset any balances on account of premiums.

Ignoring this provision, and perhaps relying on an alleged equitable right to offset in the event that Aspen's investments resulted in Aspen's insolvency, the reinsurers acquiesced in Aspen's delinquency for five consecutive quarters. In effect, the reinsurers **\*1372** were also speculating, albeit in their view at low or zero risk given the alleged right to offset. By managing their contracts with Aspen *as if* those contracts included an offset term, the reinsurers took a risk which adversely affects the interests of the public. Although any harm to the policyholders by such speculation may not materialize where the primary insurer remains solvent, the detriment to the public is uncontestable in cases of insolvency like the one before us. The commissioner's precautions against this type of abuse, therefore, are entirely reasonable and in accord with public policy.

The receiver concedes that standing alone the insolvency clause is somewhat ambiguous. Nonetheless, the receiver urges that the commissioner's disapproval of the right to offset was not based exclusively on the insolvency clause. The receiver argues that the insolvency clause should be read with the rest of section 10-3-118(4)(b), which requires that reinsurance be payable by the reinsurer on the basis of the contractual liability of Aspen, and/or read in conjunction with other relevant provisions of the insurance code. We agree. The requirement that reinsurance be payable by the reinsurer according to the liability of Aspen, the primary insurer, suggests that the legislature has corrected *Pink* not only as to the reinsurers' obligations in the event of an insolvency but also as to the very nature of the reinsurance contract. The statutory requirement makes a reinsurance contract in Colorado less a contract of indemnity and more a contract of liability enforceable by the receiver.

The exclusion of the right to offset also can be based on the commissioner's authority under sections 10-3-702(4) and 10-1-109, and his interpretations of what we will call the "absolute transfer" clause (subsection 10-3-118(4)(c)). [FN8] The absolute transfer clause

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

823 P.2d 1365                                                                                                              Page 7
823 P.2d 1365
**(Cite as: 823 P.2d 1365)**

provides that, again if a primary insurer is to take credit for reserves on risks ceded to a reinsurer, the reinsurance contract must result in the "absolute transfer to the reinsurer of risk or liability." If the reinsurers were allowed to offset Aspen's five quarters of unpaid premiums from the sums due on the reinsured policies, the transfer of risk would be less than absolute while the credit against reserves would be absolute. [FN9] This imbalance would defeat the *dual* objects sought to be attained [FN10] by the reinsurance statute, namely, increasing the underwriting capacity of the ceding insurer while *simultaneously* protecting the insured public. Diminishing the general assets of an insolvent insurer available for distribution by offsetting the premiums not paid by the insurer to the reinsurer obviously would not be in the best interests of the policyholders.

> FN8. Contrary to the reinsurers' exclusive focus on the insolvency clause, the court of appeals did rely on the absolute transfer clause as well as the insolvency clause. *Balzano v. Bluewater Ins. Ltd.,* 801 P.2d 1, 2 (Colo.App.1990). As to the trial court, it concluded in its order that "[s]ection 10-3-118(4), C.R.S., mandates two requirements in all reinsurance contracts. First, the contract must result in the absolute transfer of risk or liability to the reinsurer and, second, upon insolvency, the contractual liability assumed must be paid without diminution."

> FN9. *See Skandia America Reinsurance Corp. v. Schenck,* 441 F.Supp. 715, 725 (S.D.N.Y.1977) ("If an insurer wishes to treat its reinsurance contracts as assets for the purpose of the 10% risk limitation ..., those contracts must make the full amount of reinsurance payable to either the insurer or the ... receiver ... in the event of the insurer's insolvency.").

> FN10. *See* § 2-4-203(1)(a), 1B C.R.S. (1980) ("If a statute is ambiguous, the court, in determining the intention of the general assembly, may consider ... [t]he object sought to be attained.").

The commissioner's disapproval of the reinsurers' claimed offset rights gives sensible effect to the statute. *See Farmers Group, Inc. v. Williams,* 805 P.2d 419, 422 (Colo.1991); *Martinez v. Continental Enterprises,* 730 P.2d 308, 315 (Colo.1986) ("A statute is to be construed as a whole to give a consistent, harmonious and sensible effect to all its parts."). [FN11] Thus, even assuming the insolvency clause standing ***1373** alone is not the best basis for excluding the right to offset, the statutory requirement of an absolute transfer of risk and liability is effectuated by the exclusion. Indeed, disapproval of offset terms may be authorized under section 10-3-702(4) alone should the commissioner deem such terms inimical to policyholders or to the public, as in fact he has.

> FN11. *See also* § 2-4-201, 1B C.R.S. (1980): "(1) In enacting a statute, it is presumed that: ... (b) The entire statute is intended to be effective; (c) A just and reasonable result is intended; ... [and] (e) Public interest is favored over any private interest."

Moreover, a degree of ambiguity in the insolvency clause does not mean that the commissioner may not construe it in the manner at issue here. In *City & County of Denver v. Industrial Com'n,* 690 P.2d 199, 203 (Colo.1984), we held that the "[c]onstruction of a statute by administrative officials charged with its enforcement shall also be given deference by the courts." The commissioner is clearly charged with the enforcement of the insurance code, including the reinsurance statute. We already have shown that the insolvency clause is part of regulatory framework enforced by the commissioner in the public interest. We are satisfied that the commissioner's construction of the insolvency clause is consistent with what is reasonably allowed or required by other provisions of the reinsurance statute and, for that reason, merits deference.

From the foregoing review of the various provisions of the insurance code, we conclude that the commissioner is authorized to disapprove of a right-to-offset term in a reinsurance contract. Assuming therefore, but without deciding, that an equitable right to offset does obtain in the reinsurance context, the plain words of the statutes abrogate the alleged right to offset. *See Farmers Group,* 805 P.2d at 423 (citing *Collard v. Hohnstein,* 64 Colo. 478, 174 P. 596 (1918). [FN12]

> FN12. *See also Colorado State Board of Pharmacy v. Hallett,* 88 Colo. 331, 296 P. 540, 542 (1931) ("The Legislature may at any time by a legislative act repeal any part of the common law either expressly or by passage of an act inconsistent therewith on

any particular subject.").

We hold, therefore, that not only do the controlling statutes grant the commissioner the power to regulate reinsurance contracts, but that he may regulate them by specifically disapproving any proposed term preserving the right to offset and by modifying the contracts accordingly. See *Allendale Mut. Ins. Co. v. Melahn,* 773 F.Supp. 1283 (W.D.Mo.1991) (offset of unpaid premiums contrary to Missouri insurance code).

### C.

[2] We now examine the relevant features of the history of the reinsurance contracts here. We first note that a reinsurance contract, proposed by the parties to the commissioner, must contain *all* of the terms and conditions of the proposed contract. § 10-3-702(2). We assume that if the reinsurers here originally desired a right to offset, a specific term to that effect would have to have been included in the proposed contract. At oral arguments it was established that the commissioner prohibits the inclusion of a right to offset in proposed reinsurance contracts. It went undisputed that here the commissioner did in fact exclude a right to offset term from the contracts. After such terms were expressly disapproved by the commissioner, the reinsurers nevertheless assented to the contracts as modified. See *Matter of May,* 756 P.2d 362, 369 (Colo.1988) ("Written contracts that are complete and free from ambiguity express the intention of the parties and will be enforced according to their plain language.").

We conclude that, as a matter of contract law, the reinsurers here do not have the right to offset the unpaid premiums from the sums due to Aspen on Aspen's insured policies. Again assuming, without deciding, that there is a common law or equitable right to offset in the context of a reinsurance contract, it is incontrovertible that the expectations of the parties here were that the right to offset was *not* a term of the contracts. [FN13] The promise to pay under the reinsurance contracts therefore **\*1374** is indefeasible, and this is true whether the ceding insurer is solvent or insolvent.

> FN13. See *Benham v. Pryke,* 744 P.2d 67, 72 (Colo.1987) ("Contracts must be interpreted in light of the intentions of the contracting parties, proven in some cases ... by the requirements imposed by state statute.") ("A Court should not read into an insurance contract terms the parties never ... agreed upon.").

It bears repeating that here the reinsurers chose not to exercise their option, with due notice to the commissioner, to terminate the reinsurance contracts with Aspen for its failure to remit the premiums due under the contracts. Had the reinsurers managed their contracts otherwise, and because the premiums were due in advance, the exposure to loss by not having the right to offset could have been minimized. Although the reinsurers argue that they come before the court with clean hands, those hands are hardly spotless. We also are unmoved by the argument, presented by *amici,* that reinsurance vitally depends on the right to offset and that without it reinsurance will hastily depart the state. If this were true the reinsurers would not have assented to the "no offset" contracts in the first place.

### D.

[3] Finally, the trial court and the court of appeals held that allowing the reinsurers to offset the unpaid premiums would create a preference for the reinsurers which would be contrary to the order of distribution provided in the liquidation act. Since we hold in this opinion that the right to offset is and has been permissibly excluded by the commissioner, the issue as to whether the right creates an impermissible preference is mooted. We nevertheless briefly address this issue since the reinsurers argue that section 10-3-507(3) was intended to establish a system of priorities which tracks the system of priorities in federal bankruptcy law, and therefore also brings in tow the right to offset recognized in bankruptcy law.

In the legislative history of the insurance liquidation act, even a demonstrated intent by the legislature to borrow one element from bankruptcy law does not mean that other elements of bankruptcy, such as the recognized right to offset, were also intended. The reinsurers' "coattails" construction of the liquidation act is not persuasive. The general intent of the liquidation act was to protect the public and to establish uniformity in liquidations of insurance companies. Here, the reinsurers' acquiescence in Aspen's delinquencies makes them "other" general creditors who must get in line behind the policyholders. § 10-3-507(3)(d). In practice, the relief prayed for by the reinsurers, predicated on the existence of an equitable right to offset, would favor their private interest over the interest of policyholders, contrary to law. We hold that the full amount of the reinsurance proceeds due is a general asset to be collected and distributed according to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

823 P.2d 1365                                                                                              Page 9
823 P.2d 1365
**(Cite as: 823 P.2d 1365)**

order of priorities provided in the liquidation act.

### III.

[4] The foregoing statutory analysis disposes of this case, and a common law analysis would not lead to a different result. See *Allendale Mut. Ins. Co. v. Melahn,* 773 F.Supp. 1283 (no common law right to offset in Missouri). A common law base line, urged by the reinsurers, therefore is inapposite and serves only to deflect attention from the regulated character of the insurance business in general and of reinsurance contracts in particular. Nevertheless, because the reinsurers invite us to follow a line of late nineteenth century United States Supreme Court cases which purportedly establish the equity of broadly applying the principle of the offset of mutual debts and credits, we will discuss these and other cases briefly in order to dispel any impression that there might be a significant tension between Colorado's regulation of reinsurance and the Supreme Court's early equity jurisprudence.

The bulk of the case law invoked by the reinsurers distinguishes a unique class of fiduciary obligations from the common class of obligations arising out of mutual debts and credits where the right to offset is normally allowed. In the context of those cases, the question here is whether the obligations which the receiver seeks to enforce belong to the former class or to the latter.

The line of Supreme Court cases upon which the reinsurers rely makes it clear **\*1375** that applicability of the principle of the offset of mutual debts does not extend to cases involving obligations of a fiduciary nature. For example, *Scammon v. Kimball,* 92 U.S. 362, 368, 23 L.Ed. 483 (1876), was cited by the reinsurers for the basic proposition that in law or equity a right "exists between two parties ... to set-off their respective debts by way of mutual deduction, so that, in any action brought for the larger debt, the residue only, after such deduction, shall be recovered." However, the *Scammon* case involved two obligations each of a different nature, and the Court was unequivocal in pointing out that a debt due from an insurance company cannot offset an "indebtedness to the company for unpaid shares in the capital stock of the company, for the reason that money arising from that source constitutes a trust fund for the payment of the debts of the company...." *Id.* 92 U.S. at 366. Indeed, the *Scammon* Court held that "*[e]quity* regards the capital stock and property of a corporation as held in trust for the payment of the debts of the corporation." *Id.* at 367 (emphasis added). Thus, although the Court used the term "indebtedness" to characterize the obligation to pay the capital subscriptions, that obligation is not a normal debt to be treated according to the principle of mutual offsets. The fiduciary nature of the "indebtedness" is evident.

The Court in *Scammon,* 92 U.S. at 366, cited its earlier decision in *Sawyer v. Hoag,* 84 U.S. (17 Wall) 610, 620, 21 L.Ed. 731 (1873), which the reinsurers failed to cite, for the well-established rule that capital stock, especially an unpaid subscription for capital stock, "is a trust fund for the benefit of the general creditors of the corporation." The Court did not depart from this rule in *Carr v. Hamilton,* 129 U.S. 252, 9 S.Ct. 295, 32 L.Ed. 669 (1889), which the reinsurers did cite. Although an offset was allowed in *Carr,* there the creditor was also a policyholder with the insolvent insurance company, [FN14] not a reinsurer, which may have made the case one involving mutual debts. The *Carr* Court noted that its decision was in concurrence with *Scammon,* meaning that it was consistent with the general rule that the fiduciary nature of an unpaid stock subscription cannot be subsumed by the principle of the offset of mutual debts and credits. *Carr,* 129 U.S. at 262, 9 S.Ct. at 298.

> FN14. *But see Aronoff v. Carraher,* 146 Colo. 223, 361 P.2d 354, 358 (1961) ("All persons having claims must be treated equally, and the fact that an individual claimant happens to be a policyholder does not entitle him to a preference.").

Here, the receiver contends that once credited against reserves, reinsurance represents a capital commitment to the primary insurer and becomes dedicated to the security of the ceding insurer's policyholders. This means in effect that the reinsurers hold the full amount of reinsurance liability credits in a fiduciary capacity. *See Wetzel Services, Inc. v. Johnson,* 821 P.2d 804, 809 (Colo.1991) (discussing the quasi-fiduciary nature of the insurer-insured relationship). On the other side, the reinsurers, relying on *Matter of Midland Ins. Co.,* 167 A.D.2d 75, 569 N.Y.S.2d 951 (1 Dept.1991), argue that reinsurance is merely a contractual commitment to pay certain funds in the event of a loss and that the proceeds due under this commitment therefore are not held by the commissioner as trust funds. We agree with the receiver.

In *Midland,* the court misconstrued *Carr* as supporting the proposition that offsets are universally allowed even in the absence of an agreement or a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

823 P.2d 1365                                                                                                                Page 10
823 P.2d 1365
**(Cite as: 823 P.2d 1365)**

statutory provision specifically allowing offsets in liquidation proceedings. *Midland,* 569 N.Y.S.2d at 953. The *Midland* court simply ignores *Carr*'s insistence that the *Scammon* distinction between mutual obligations and fiduciary obligations has been preserved. In any event, *Midland* was decided on the basis of a provision of the New York insurance code specifically allowing offsets in insurance liquidation proceedings. *See* N.Y. Insurance Law § 7427(a) (McKinney 1985).

Similarly, in *Stamp v. Insurance Co. of North America,* 908 F.2d 1375 (7th Cir.1990), invoked by the reinsurers for its economic analysis, the court construed a section of the Illinois insurance code which also specifically provided that certain mutual *1376 debts could be offset. *See* Ill.Rev.Stat. ch. 73, § 818 (1983). It should be apparent by now that Colorado's insurance code has no similar provision. We must decline to follow the New York court and the Seventh Circuit Court of Appeals, because both were required to construe and apply the New York and Illinois insurance codes respectively. *See Allendale Mut. Ins. Co. v. Melahn,* 773 F.Supp. 1283 (W.D.Mo.1991) (contract provision preserving the right to offset according to New York insurance code not enforceable because contrary to Missouri insurance code).

However much those and other decisions from other jurisdictions may inform this court, the state of Colorado has a different view of what is in the best interests of policyholders and the public. As to the right to offset unpaid premiums from the full amounts due from reinsurance, analogies to bankruptcy cases are inapposite, as are cases from other jurisdictions which have analogized insurance company insolvencies to bankruptcy. We conclude that the obligation to pay the proceeds due under reinsured policies, like the obligation to pay unpaid capital subscriptions, cannot be diminished by debts (unpaid premiums) owed by the insolvent insurer.

The reinsurers also cite *Scott v. Armstrong,* 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892), in further support of a broad equitable right to offset. *Scott,* however, involved a bank in receivership, and the Court allowed a debtor to offset deposited funds from the amounts owed to the bank. The governing statutes made no provision for the right to offset, and the principle of the offset of mutual debts apparently filled the vacuum. *Scott* does not stand for a broad equitable right to offset, much less such a right in the context of regulated reinsurance contracts. Indeed, *Scott* is instructive for present purposes because there

the Court held that "natural justice would seem to require" the right to offset "where the transaction is such as to raise the presumption of an agreement for a set-off." *Id.* at 508. Here, the reinsurance transactions were such that not only does that presumption not arise, but that it is manifest that the reinsurers agreed to forego the right to offset. These Supreme Court cases, then, which otherwise recognize the principle of the offset of mutual debts and credits, do not support an equitable right to offset so broad as to apply to reinsurance. If anything, these cases suggest that equity requires that the full amount of the proceeds from reinsurance be due and payable to the receiver for the benefit of the insureds. Thus, we would reach the same result under the common law as we have reached under the applicable regulatory law.

IV.

To summarize, it is evident that reinsurance contracts in Colorado are not normal contracts to which the equitable right to offset mutual debts applies. Rather, reinsurance contracts are regulated transactions, the terms and conditions of which must be approved by the insurance commissioner, as they in fact were in this case. The right to offset was excluded, and the reinsurers freely entered into these "no offset" contracts. Furthermore, any exercise of the right to offset here in effect would create a preference for the reinsurers over the policyholders in the distribution of Aspen's assets, contrary to public policy. Lastly, equity requires that in cases of fiduciary or quasi-fiduciary obligation the right to offset does not apply. The receiver may collect the full amount of the proceeds due from the reinsurers as part of the general assets of the insolvent insurer.

Judgment affirmed.

ERICKSON, J., does not participate.

823 P.2d 1365

**Briefs and Other Related Documents (Back to top)**

• 1991 WL 11040952 (Appellate Brief) Petitioners' Reply Brief (May. 24, 1991)Original Image of this Document with Appendix (PDF)

• 1991 WL 11034540 (Appellate Brief) Response Brief (Apr. 25, 1991)Original Image of this Document with Appendix (PDF)

• 1991 WL 11034539 (Appellate Brief) Brief of Amici Curiae the American Council of Life

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

823 P.2d 1365                                                                                                                    Page 11
823 P.2d 1365
**(Cite as: 823 P.2d 1365)**

Insurance, the Reinsurance Association of America, the American Insurance Association, the Alliance of American Insurers and the National Association of Independent Insurers (Feb. 22, 1991)Original Image of this Document (PDF)

• 1991 WL 11034538  (Appellate Brief) Petitioners' Opening Brief (Feb. 21, 1991)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.