# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

MAR 18  1 34 PM '05

U.S. DISTRICT COURT
NEW HAVEN, CONN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:02 CV 889 (EBB) |
| | : | |
| 277 DIAMONDS VALUED AT APPROXIMATELY $2,461,093.00 | : | |
| | : | |
| ONE (1) PAIR OF DIAMOND EARRINGS, VALUED AT APPROXIMATELY $40,120.00, | : | |
| | : | |
| AND | : | |
| | : | |
| ONE (1) PLATINUM AND DIAMOND RING VALUED AT APPROXIMATELY $25,935.00 | : | |
| | : | |
| Defendants. | : | |

**VERIFIED STATEMENT OF INTEREST OR RIGHT OF
PEOPLES BENEFIT LIFE INSURANCE COMPANY
AND VETERANS LIFE INSURANCE COMPANY AND JURY DEMAND**

Peoples Benefit Life Insurance Company ("Peoples") and Veterans Life Insurance

Company ("Veterans") (collectively, the "Claimants"), by and through their attorneys, Rosen &

Dolan and Lord, Bissell & Brook, pursuant to 18 U.S.C. § 983(a)(4)(A) and Rule C(6) of the

Supplemental Rules for Certain Admiralty and Maritime Claims, for their statement of interest or

right in certain of the 277 Diamonds, the pair of diamond earrings and the platinum and diamond

ring (collectively the "Defendant Properties"),[1] state as follows:

---

[1] Other properties that are the subject of other forfeiture proceedings currently pending before this Court are also the property of the Claimants. These additional properties and Claimants' ownership rights are set forth in the Petitioner for Declaratory Relief of Huff-Cook, Inc., Peoples Benefit Life Insurance Company and Veterans Life Insurance Company filed in *Dale v. First National Life Insurance Company of America*, Civil Action No. G99-

and diamond ring (collectively the "Defendant Properties"),[1] state as follows:

     1.    Huff Cook, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia. At all relevant times, Huff Cook, Inc. (then known as the Settlers Companies, Inc.) was the sole shareholder of the Settlers Life Insurance Company, a corporation organized as a life insurance company under Virginia law. On May 14, 1999, Settlers Life Insurance Company was placed in receivership by order of the Circuit Court of Richmond, Virginia, with the State Corporation Commission of Virginia as Receiver, and the Insurance Commissioner, the Honorable Alfred W. Gross, as deputy Receiver. On December 1, 1999, the State Corporation Commission, as Receiver of Settlers Life Insurance Company, assigned to Huff Cook, Inc. (then known as the Settlers Companies, Inc.) the right to prosecute the claims of Settlers Life Insurance Company arising out of the activities of Martin Frankel ("Frankel"), Frankel's associates and associated entities, and to receive a portion of any recoveries thereon as compensation for the loss by Huff Cook of its ownership interest in Settlers Life Insurance Company. As a part of the transactions that led to the assignment to Huff Cook of the right to prosecute these claims and interests, Settlers Life Insurance Company was released from receivership.

     2.    Huff Cook, on its own behalf and on behalf of Settlers, asserts its statement of interest or right in part of the Defendant Properties. However, should this Court find that Huff

---

[1] Other properties that are the subject of other forfeiture proceedings currently pending before this Court are also the property of the Claimants. These additional properties and Claimants' ownership rights are set forth in the Petitioner for Declaratory Relief of Huff-Cook, Inc., Peoples Benefit Life Insurance Company and Veterans Life Insurance Company filed in *Dale v. First National Life Insurance Company of America*, Civil Action No. G99-908S2, Chancery Court of Hinds County, Mississippi. These additional properties are currently before this Court in *United States v. $29,035,500.00*, Civil No. 3:01CV1515(EBB) and *United States v. $11,014,165.20*, Civil No. 3:99CV02589(EBB). The proof establishing Claimants' right to the Defendant Properties in the present case are equally applicable to proving Claimants' right to these other properties.

Cook is not the proper party to assert such interest or right, or that Settlers is a necessary or proper party to these proceedings, alternatively Settlers on its own behalf, through this Statement, asserts an interest or right in part of the Defendant Properties.

3.    Huff Cook has filed a Petition in the FNLIC liquidation proceedings currently pending in the Chancery Court of Hinds County, Mississippi, seeking declaratory and other relief establishing a constructive trust over some of the Defendant Properties. (A copy of the Petition is attached hereto as Exhibit 1, and is incorporated herein by reference as if fully set forth.) The monies stolen from Claimants by Frankel, FNLIC and others are not now, nor were they ever part of the FNLIC estate but at all times remained the property of the Claimants and must be returned to Claimants.[2]  Discovery is proceeding in the Chancery Court and the case will most likely be set for trial at the end of this year or early next year.

4.    The Defendant Properties are the proceeds of the fraud perpetrated by Frankel, FNLIC and others wherein Frankel and his henchmen used FNLIC as a vehicle to defraud Claimants out of nearly $15 million.  As a result of the theft of Claimants' funds, as well as other misconduct by Frankel, FNLIC and others, FNLIC was placed in rehabilitation by the Mississippi Commissioner of Insurance on or about May 10, 1999.  The rehabilitation order was later converted into an order of liquidation.

5.    As of the beginning of 1998, Settlers had a group of existing policies (a "book of business") of burial insurance called the "Care Plan" book.  Settlers had discontinued selling this

---

[2] Claimants intend to file an Amended Petition in the Mississippi liquidation proceedings to include claims seeking the recovery of the property at issue in this case.  Claimants became aware of the present proceedings when they received notice from the U.S. Attorneys' office via letter dated March 21, 2003.  (A copy of the letter is attached hereto as Exhibit 2.)  The U.S. Attorneys' office inadvertently forgot to send notice of the forfeiture complaint.  Several state insurance departments filed statements of interest beginning on March 14, 2003.

3

type of policy and was holding approximately $46 million as reserves for the payment of claims of the policyholders for this "book of business." As Settlers no longer sold this type of policy, it was interested in "selling" this book to another insurance company.

6.     In early 1999, representatives of FNLIC approached Settlers regarding entering into an agreement with Settlers to acquire the Care Plan book of business by an assumption reinsurance transaction. FNLIC agreed to pay $1.75 million for the Care Plan book of business. This payment was to take the form of a "ceding commission" which would be deducted from the reserves for the book which Settlers would transfer to FNLIC. In other words, Settlers would transfer to FNLIC approximately $46 million in liabilities associated with the Care Plan business and $44,795,000 in cash reserves (the "Reserve Fund").

7.     Settlers was induced to enter into the assumption reinsurance agreement ("Agreement") by misrepresentations that FNLIC was a solvent and prosperous company. Additionally, Settlers relied on the materially false and misleading financial statements of FNLIC, which were sent to Settlers by mail and wire as a direct inducement for Settlers to transfer money to FNLIC. Settlers also relied on the crucial representation that FNLIC would continue to use the reserve fund associated with the book of business for its intended purpose, namely the administration of the book of business and the payment of policyholder claims, Claimants entered into a set of agreements with FNLIC.

8.     On or about April 1, 1999, FNLIC obtained Settler's commitment to enter into the Agreement. Settlers agreed to transfer the Reserve Fund pursuant to the Agreement only after FNLIC provided it with a financial statement for the year ended December 31, 1998. This statement falsely showed that FNLIC had over $100 million of assets. Settlers relied upon the

4

materially misleading and false financial statement as an inducement to transfer the Reserve Fund to FNLIC under the Agreement.

9.    The Agreement required approval from regulators, including the Mississippi Department of Insurance, before it could become effective.  The Agreement specifically provided that it was "subject to and contingent upon receipt by Ceder [Settlers] and Reinsurer [FNLIC] of any required regulatory approvals of the transaction."

10.    Before seeking the required regulatory approvals, FNLIC requested that Settlers transfer the Reserve Fund.  On Friday, April 9, 1999, Settlers complied and transferred a total of $44,795,476.00 to FNLIC's account no. 100057727 at First Tennessee Bank in Memphis, Tennessee.  Unknown to Settlers, FNLIC never obtained the approval of regulators for the Agreement.

11.    The Reserve Fund remained in FNLIC's bank account for less than three hours. At 13:11 central daylight time on April 9,1999, as alleged by the United States in the Verified Complaint in this matter, Frankel caused the Reserve Fund to be transferred from FNLIC's First Tennessee account to an account at the Bank of New York, in New York, New York, for the benefit of Dreyfus Cash Management Plus ("Dreyfus Account"), with a notation "Attention: Lion System DDA #8900052252/AC-719-079- 1438435 OBI=Reference FNL Co. of America Receiving Dealer #2552."  (Verified Compl. ¶ 39.)

12.    The Dreyfus Account was in the name of "FNL CO OF AMERICA REC ACCT." The Dealer was identified as #002552, and the "REP" was identified as "LNS, Inc.; 405 Tarrytown Road, Suite 212, White Plains, NY 10807 1326."  This account was controlled by Frankel.

5

13.    The Dreyfus Account was a sham, as Dreyfus had standing instructions from Frankel that any securities transferred to the account were to be redeemed, and, together with any cash in the account, were to be wire transferred to UBS Bank in New York, for further credit to Banque SCS Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA."

14.    In accordance with Frankel's standing instructions, and as alleged in the Verified Complaint, on April 12, 1999, the Monday after the Claimants' Reserve Fund was wired to the Dreyfus account, Dreyfus wired the Reserve Fund to Banque SCS Alliance SA, Geneva. (Verified Compl. ¶ 37.)

15.    Before the Settlers Reserve Fund was wired to Account Number 70026 at Banque SCS Alliance SA in Geneva, the balance of that account had dwindled to $931,946.62.

16.    According to the allegations in the United States' Verified Complaint, on May 3, 1999, Frankel wire transferred $10,000,000 from Account Number 70026 at Banque SCS Alliance to Account Number 0102931920, held in the name of Worldwide Diamond, at Bank Leumi, Beverly Hills, California for the purchase of diamonds.  (Verified Compl. ¶ 46.)

17.    According to the allegations in the United States' Verified Complaint, on or about May 4, 2002, a representative of Worldwide Diamond Company and another individual assisting in the transaction, flew to Teterboro Airport in New Jersey with approximately $6 million worth of diamonds.  Additional diamonds valued at $3 million were to be picked up in New York City as part of the $10 million transaction with Martin Frankel.  (Verified Compl. ¶ 47.)

18.    As alleged by the United States, some of the Defendant Properties were purchased by Frankel in the $10 million transactions with Worldwide Diamond Company, and/or that these

diamonds were purchased with the proceeds of Frankel's fraudulent scheme. (Verified Compl. 52.)

19.    On information and belief, part of the Defendant Properties is the proceeds of, or traceable to the proceeds of, the Reserve Fund.

20.    The Reserve Fund, held by FNLIC in constructive trust for the benefit of the Claimants, was the Claimants' property when stolen by Frankel. Claimants therefore assert an interest and/or right in part of the Defendant Properties.

21.    In the alternative, when the regulators failed to approve the Agreement, FNLIC should have repaid the Claimants the Reserve Fund, which in equity and good conscience belonged to the Claimants and which FNLIC had no right to retain. Under a money had and received theory, Claimants were and are entitled to a return of their Reserve Fund. Claimants therefore assert an interest and/or right in part of the Defendant Properties.

22.    Huff Cook, Inc. and Settlers Life Insurance Company, pursuant to Federal Rule of Civil Procedure 38, hereby demand a trial by jury for all issues so triable.

Dated: April 10, 2003                    HUFF COOK, INC. AND SETTLERS LIFE
                                         INSURANCE COMPANY


                                         By: _____
                                              David N. Rosen
                                              Rosen & Dolan
                                              400 Orange Street
                                              New Haven, CT 06511
                                              Federal Bar No. 000196
                                              Telephone: (203) 787-3513
                                              Telecopy: (203) 789-1605


Of counsel:

7

Forrest B. Lammiman
Timothy M. Maggio
A. Kelly Turner
Brian I. Hays
Lord, Bissell & Brook
115 South LaSalle Street
Chicago, IL  60603
Telephone:  (312 ) 443-0700
Telecopy:  (312) 443-0336

Lane Wharton
Bode, Call & Stroupe, L.L.P.
3105 Glenwood Avenue, Suite 300
Raleigh, NC 27612
Telephone:  (919) 881-0338
Telecopy:  (919) 881-9548

# VERIFICATION

I, Jack F. Harmon, declare that I am President of Huff Cook, Inc. and am authorized to make this verification on behalf of Huff Cook, Inc. and Settlers Life Insurance Company. I declare under penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing VERIFIED STATEMENT OF INTEREST OR RIGHT OF HUFF COOK, INC. OR, IN THE ALTERNATIVE, SETTLERS LIFE INSURANCE COMPANY is true and correct.

Executed on: April 8th, 2003

Jack F. Harmon

9

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that true and correct copies of the foregoing VERIFIED STATEMENT OF INTEREST OR RIGHT OF HUFF COOK, INC. OR, IN THE ALTERNATIVE, SETTLERS LIFE INSURANCE COMPANY were served via U.S. mail, First Class, postage prepaid on April 10, 2003 on:

    David X. Sullivan
    Assistant United States Attorney
    P.O. Box 1824
    New Haven, Connecticut 06508

    Douglas S. Skalka
    Neubert, Pepe & Monteith
    195 Church St.
    13th Floor
    New Haven, CT 06510-2026

                                              David N. Rosen

# EXHIBIT 1

**IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI**

GEORGE DALE, COMMISSIONER OF
INSURANCE OF THE STATE OF MISSISSIPPI                          PLAINTIFF

V.                                                     CIVIL ACTION NO. G99-908S2

FIRST NATIONAL LIFE INSURANCE COMPANY
OF AMERICA, A MISSISSIPPI DOMICILED
INSURANCE COMPANY                                             DEFENDANT

**PETITION FOR DECLARATORY RELIEF OF
HUFF-COOK, INC., PEOPLES BENEFIT LIFE INSURANCE COMPANY
AND VETERANS LIFE INSURANCE COMPANY**

Huff-Cook, Inc. ("Settlers"), Peoples Benefit Life Insurance Company ("Peoples"), and

Veterans Life Insurance Company ("Veterans") (collectively, the "Petitioners") submit this Petition

seeking a declaration by this Court that certain property owned by the Petitioners in which the

Honorable George Dale, Commissioner of Insurance for the State of Mississippi (the "Liquidator"),

in his capacity as Liquidator of First National Life Insurance Company ("First National Life"), asserts

an interest is not part of the estate of First National Life. Instead, that property is impressed with a

constructive or other equitable trust in favor of the Petitioners. In the alternative, Petitioners seek

a declaration by this Court that Petitioners are secured creditors of First National Life. In further

support, Petitioners allege as follows:

**JURISDICTION**

1.      This Court has jurisdiction over this matter pursuant to Mississippi Insurers

Rehabilitation and Liquidation Act. Miss. Code Ann.

2.      This Court also has jurisdiction over this matter pursuant to Mississippi Rule of Civil

Procedure 57.

## THE PARTIES

3.      Huff-Cook, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia.  At all relevant times, Huff-Cook, Inc. (then known as the Settlers Companies, Inc.) was the sole shareholder of the Settlers Life Insurance Company, a corporation organized as a life insurance company under Virginia law.  On April 9, 1999, First National Life defrauded Settlers Life Insurance Company of $44.8 million pursuant to a scheme described below. As a direct result of First National Life's fraud, Settlers Life Insurance Company was placed in receivership on May 14, 1999 by order of the Circuit Court of Richmond, Virginia, with the State Corporation Commission of Virginia as Receiver, and the Insurance Commissioner, the Honorable Alfred W. Gross, as deputy Receiver.  On December 1, 1999, the State Corporation Commission, as Receiver of Settlers Life Insurance Company, assigned to Huff-Cook, Inc. (then known as the Settlers Companies, Inc.) the right to prosecute the claims of Settlers Life Insurance Company arising out of the activities of Martin Frankel ("Frankel"), Frankel's associates and associated entities (including First National Life).

4.      Peoples Benefit Life Insurance Company is a corporation organized and existing under the laws of the State of Iowa with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

5.      Veterans Life Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 20 Moores Road, Frazer, Pennsylvania.

-2-

6.      Plaintiff George Dale is the duly-appointed Liquidator of the Mississippi domiciled First National Life Insurance Company of America, pursuant to an Order of Liquidation entered on June 29, 1999, by this Court. Prior to being placed into liquidation, First National Life had been subject to an Order of Rehabilitation entered on May 10,1999.

7.      Defendant First National Life Insurance Company is a Mississippi domiciled insurance company. First National Life Insurance Company of America is subject to an Order of Liquidation entered on June 29, 1999, by this Court.

## STATEMENT OF FACTS

### A.    Background Information

8.      From at least 1991 until 1999, Frankel, John Hackney ("Hackney"), Gary Atnip ("Atnip") and others executed a scheme to defraud companies out of hundreds of millions of dollars. The fraudulent scheme included the use of various corporations and corporate entities including Liberty National Securities, Inc. ("LNS"), Bloomfield Investments, Ltd., and Devonshire Technologies Ltd. The fraudulent operations focused primarily on ostensibly investing, through LNS, the assets of certain insurance companies. In truth, Frankel, Hackney, Atnip, through First National Life and other companies, systematically drained the assets of the insurance companies through various transfers into and out of numerous domestic and international accounts.

9.      In approximately 1993, Frankel established the Thunor Trust in Tennessee. Hackney was the sole trustee of the Thunor Trust. The Thunor Trust was established to acquire ownership of insurance companies, including Franklin American Life Insurance Company ("Franklin American Life") in 1993 and First National Life in 1997 Hackney was a trustee of the Thunor Trust from the

-3-

first. The purpose in acquiring these companies, and others, was to loot the assets of these and other companies, including the Petitioners.

10.      Hackney also was the president and chairman of the board of directors of First National Life.

11.      Atnip was the chief financial officer of Franklin American Corporation who, together with Hackney, served as the investment committee for First National Life.

12.      The fraudulent operations began to unravel after the Greenwich (Connecticut) Police Department searched a residence of Frankel that had been the scene of a fire on May 5, 1999.  The search revealed that the house in Greenwich had apparently been used as brokerage office with an active trading floor and 80-plus computers and various telecommunications equipment providing a continual flow of financial and trading market information.  Records obtained during the search identified various business entities that had been operated by Frankel from the house.  Also recovered from the residence were astrological charts created to answer questions such as "Will I go to prison?" and "Should I wire money back from overseas?"  Included among documents recovered from the fire at the house was a "to do" list, with the first item listed as "Launder money."

13.      On September 22, 2000, Hackney pled guilty to multiple counts of wire fraud and money laundering based, in part, on his role in First National Life's theft of approximately $60 million from Settlers, Peoples and Veterans, some of which was a significant component of the approximately $200 million stolen from these and other entities.  Hackney has confessed that he personally received almost $8 million over the years from the fraudulently obtained funds.

-4-

14.    Frankel and Atnip have been indicted by a federal grand jury and charged with numerous counts of wire fraud and money laundering, as well as participating in a Racketeer Influenced and Corrupt Organization, conspiracy to participate in a Racketeer Influenced and Corrupt Organization, and securities fraud based, in part, on their role in First National Life's theft of approximately $60 million from Settlers, Peoples and Veterans.    Atnip improperly received approximately $700,000 directly from Account 70026 at Banque SCS Alliance in Geneva, Switzerland.

15.    Pursuant to a number of warrants, the United States has seized a number of assets that are proceeds of the fraudulent scheme.    These assets are the subjects of a number of forfeiture proceedings currently pending before Judge Burns in the United States District Court for the District of Connecticut including United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB) and United States v. $11,014,165.20, Civil No. 3:99CV02589(EBB).

16.    The Petitioners have filed Verified Statements of Interest or Right and sought to intervene in a number of these forfeiture proceedings.

17.    The forfeiture proceedings have been consolidated before Judge Burns in the United States District Court for the District of Connecticut.    By order dated October 31, 2000, Judge Burns denied Peoples and Veterans motion to intervene in the forfeiture proceedings.    United States v. One 1995 Turbo Commander, No. 3:99-CV-2590, No. 3:99-CV-2589, 2000 WL 18388334, *2.    The United States Court of Appeals for the Second Circuit affirmed the denial of Peoples and Veterans' motion to intervene and directed Peoples and Veterans to pursue their constructive trust claims in the

present First National Life receivership proceeding.  <u>United States v. Peoples Benefit Life Ins. Co.</u>, 271 F.3d 411, 416-17 (2d Cir. 2001).

18.    Through bank records, the Petitioners can trace substantial portions of the funds stolen from them by First National Life to assets in these forfeiture proceedings initiated by the United States government in federal court in Connecticut.

**B.    <u>First National Life Defrauded Settlers Out of Nearly $44.8 Million</u>**

19.    As of the beginning of 1998, Settlers had a group of existing policies (a "book of business") of burial insurance called the "Care Plan" book.  Settlers had discontinued selling this type of policy and was holding approximately $46 million as reserves for the payment of claims of the policyholders for this "book of business."  As Settlers no longer sold this type of policy, it was interested in selling this book to another insurance company.

20.    In early 1999, representatives of First National Life approached Settlers regarding entering into an agreement with Settlers to acquire the Care Plan book of business by an assumption reinsurance transaction.  First National Life agreed to pay $1.75 million for the Care Plan book of business.  This payment was to take the form of a "ceding commission" which would be deducted from the reserves for the book, which Settlers would transfer to First National Life.  In other words, Settlers would transfer to First National Life approximately $46 million in liabilities associated with the Care Plan business and $44,795,000 in cash reserves (the "Settlers Reserve Fund").

21.    Settlers was fraudulently induced to enter into the assumption reinsurance agreement ("Settlers Agreement," a copy of which is attached hereto as Exhibit A), in part by First National Life's misrepresentations that it was a solvent and prosperous company.  More important, First

National Life also fraudulently represented that any funds transferred to First National Life under the Settlers Agreement would be used to administer the book of business and pay policyholder claims, when in fact, First National Life intended that the Reserve Funds would be misappropriated immediately for the personal use of Frankel, Hackney, Atnip and their accomplices and associates. Settlers entered into the Settlers Agreement in reliance on these representations.

22.    The Settlers Agreement required approval from regulators, including the Mississippi Department of Insurance, before assumption of the book of business could become effective. The Settlers Agreement specifically provided that it was "subject to and contingent upon receipt by Ceder [Settlers] and Reinsurer [First National Life] of any required regulatory approvals of the transaction."

23.    Before seeking the required regulatory approvals, First National Life requested that Settlers transfer the Settlers Reserve Fund. On Friday, April 9, 1999, Settlers complied and transferred a total of $44,795,476.00 to First National Life's account no. 100057727 at First Tennessee Bank in Memphis, Tennessee. First National Life never obtained the approval of regulators for the Settlers Agreement, and could never have properly obtained that approval. More significant, First National Life had intended from the first to defraud Settlers and to immediately misappropriate the Settlers Reserve Fund for the benefit of certain of First National Life's insiders, e.g., Frankel, Hackney and Atnip. First National Life acted quickly to consummate the fraud.

24.    The Settlers Reserve Fund remained in First National Life's bank account for less than three hours. At 13:11 central daylight time on April 9, 1999, First National Life caused the $44,795,000 Settlers Reserve Fund to be transferred from First National Life's First Tennessee account to an account at the Bank of New York, in New York, New York, for the benefit of Dreyfus

Cash Management Plus ("Dreyfus Account"), with a notation "Attention: Lion System DDA #8900052252/AC-719-079-1438435 OBI=Reference FNL Co. of America Receiving Dealer #2552."

25.    The Dreyfus Account was in the name of "FNL CO OF AMERICA REC ACCT." The Dealer was identified as #002552, and the "REP" was identified as "LNS, Inc.; 405 Tarrytown Road, Suite 212, White Plains, NY 10807 1326." This account was controlled by Frankel.

26.    The Dreyfus Account was a sham. Any securities transferred to the account were to be redeemed, and, together with any cash in the account, were to be wire transferred to UBS Bank in New York, for further credit to Banque SCS Alliance SA, in Geneva, Switzerland, sub account no. 70026, for further credit to "BENEFICIARY BLOOMFIELD INV LTD FC TO FNL CO OF AMERICA."

27.    On April 12, 1999, the Monday after the Settlers Reserve Fund was wired to the Dreyfus account, Dreyfus wired the Reserve Fund of $44,795,000.00, together with $17,640.49 in accrued interest, to Banque SCS Alliance SA, Geneva, via UBS as primary bank.

28.    Before the Settlers Reserve Fund was wired to the Bloomfield Investments, Ltd. account at Banque SCS Alliance SA in Geneva, the balance of that account had dwindled to $931,946.62.

29.    After the April 12, 1999 wire transfer of the Settlers Reserve Fund, plus interest, to the Bloomfield Investments, Ltd.'s account at Banque SCS Alliance SA, and continuing until the date this account was frozen, the $44,795,000 of proceeds of the Settlers Reserve Fund constitutes the overwhelming bulk of new funds deposited in the account.

30.     First National Life's immediate misappropriation of that Fund for the use of First National Life's insiders, rather than as a reserve to pay claims and administer the book of business, was disastrous for Settlers.  Settlers was still liable to the policyholders on the subject book of business, even though First National Life had stolen the Reserve Fund.  As a result, Settlers was forced into liquidation proceedings in Virginia only two months later, and its individual owners (who had built up Settlers over the course of nearly half a century) lost a company that had had an estimated $20 million in equity prior to the fraud perpetrated by First National Life.

**C.      Tracing the Settlers Reverse Fund**

31.     Much of the Settlers Reserve Fund can be traced directly to assets currently subject to civil forfeiture proceedings in Connecticut.

**(a)      $29 Million of the Settlers Reserve Fund are Directly Traceable to Banque SCS Alliance Account 70026**

32.     As set forth above, the Settlers Reserve Fund was deposited in Account 70026 on April 12, 1999.

33.     On May 7, 1999, Frankel caused $28,000,000 to be transferred from Account 70026 to Bank Monte dei Paschi di Siena in Florence, Italy, to the order of Sanita PIU, S.P.A., for an alleged investment in a corporation.

34.     On May 14, 1999, Account 70026 had a balance of $30,384.30.

35.     On June 27, 1999, Account 70026 was frozen pursuant to a request of the United States Government in accordance with a Mutual Legal Assistance Treaty between Switzerland and the United States.

36.    On July 7, 1999, the amount of $26,499,980 was returned to Account 70026 by wire transfer from Bank Monte dei Paschi di Siena, order of Sanity PIU, S.P.A., as repayment of an investment in a corporation resulting from the execution of a cancellation agreement.

37.    In 1999, all funds in Account 70026 were frozen by the Swiss government pursuant to an order entered by Magistrate Barbey in Geneva, Switzerland. After months of negotiations with the United States Department of Justice, on or about June 28, 2000, the funds contained in Account 70026, $29,035,500, finally were wire transferred to Account 20X6875(06), held in the name of U.S. Customs Suspense Account, at the Federal Reserve Bank of New York.

38.    On July 6, 2001, the Internal Revenue Service Criminal Investigation seized the $29,035,500 pursuant to a seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge of the United States District Court for the District of Connecticut.

39.    Most of the funds seized from Account 70026 are clearly traceable to the Settlers Reserve Fund. On April 11, 1999, Account 70026 had $931,946.62. Immediately prior to the deposit of the Settlers' Reserve Fund, Account 70026 had been virtually emptied. From April 12, 1999 through the date Account 70026 was frozen, few other amounts were credited to the account. The majority of the funds in the account at the time it was seized could only have come from the Settlers Reserve Fund.

40.    These assets are currently the subject of a civil forfeiture action pending before Judge Burns in the United States District Court for the District of Connecticut in a case entitled United States v. $29,035,500.00, Civil No. 3:01CV1515(EBB).

**(b)   Other Transfers from Account 70026 are Traceable to the Settlers Reserve Fund.**

41.   Martin Frankel made the following additional wire transfers from his Bloomfield Investments, Ltd. account number 70026 at Banque SCS Alliance:

(1)   On May 14, 1999, Frankel wire transferred $160,000.00 into Account Number 026-015-0998, held in the name of Jacqueline A. Ju, at People's Bank, Bridgeport, Connecticut.

(2)   Frankel made the following wire transfers into Account Number 641-7028470, held in the name of Beng Tan, at Putnam Trust Company, Greenwich, Connecticut:
(a)   the amount of $88,000.00 on May 3, 1999;
(b)   the amount of $20,000.00 on May 6, 1999; and
(c)   the amount of $4,500.00 on May 17, 1999.

(3)   Frankel made the following wire transfers into Account Number 4461533, held in the name of Gomberg, Kane & Fisher, Ltd., Client Fund Account, at Northern Trust, Chicago, Illinois:
(a)   the amount of $100,000.00 on May 6, 1999, for the benefit of Karen Timmins;
(b)   the amount of $400,000.00 on May 6, 1999, for the benefit of Martin Frankel; and
(c)   the amount of $100,000.00 on May 6, 1999, for the benefit of Sonia Howe.

(4)   On May 5, 1999, Frankel wire transferred $75,000.00 into Account Number 0000267694, held in the name of Thomas A. Bolan, at Bank of New York, New York, New York.

(5)   On May 5, 1999, Frankel wire transferred $50,000.00 into Account Number 4705/6255, held in the name of Jiro and Yasuko Nakamura, at Citibank, New York, New York.

(6)   On May 3, 1999, Frankel wire transferred $50,000.00 into Account Number 29692637, held in the name of Beng Tan, at Citibank, White Plains, New York.

(7)    On April 23, 1999, Frankel wire transferred $750,000.00 into Account Number 96968953, held in the name of Victor C. Moses, at Seafirst Bank, Seattle, Washington.

(8)    On May 7, 1999, Frankel wire transferred $10,000.00 into Account Number 110114, held in the name of Highland Industrial Park, at Hudson Valley Bank, Pickle, New York.

(9)    On April 21, 1999, Frankel wire transferred $542,850.00 into Account Number 0111146957, held in the name of Fausto Fausti, at Chase Manhattan Bank, New York, New York.

(10)   On April 14, 1999, Frankel wire transferred $650,000.00 into Account Number 42535468, held in the name of Bruce I. Weiser, at Citibank, Stamford, Connecticut.

(11)   On April 16, 1999, Frankel wire transferred $1,395,000.00 into Account Number 70134101, held in the name of North Mississippi Aviation, Inc., at Falkner Bank, Falkner, Mississippi.

(12)   Frankel made the following wire transfers into American Express Credit Card Number 37383880008008, in the name of K. Schuchter, at American Express, New York, New York:
   (a)    the amount of $100,000.00 on May 5, 1999; and
   (b)    the amount of $200,000.00 on May 6, 1999.

(13)   Frankel made the following wire transfers into Account Number 1080305385, held in the name of Park Avenue Travel Services, at Bank of New York, New York, New York:
   (a)    the amount of $50,000.00 on May 5, 1999;
   (b)    the amount of $400,000.00 on May 6, 1999; and
   (c)    the amount of $500,000.00 on May 7, 1999.

42.    These monies are directly traceable to the Settlers Reserve Fund. The transfers listed above totaled $5,645,350.00. As set forth above, as of April 11, 1999, Account 70026 only had $931,946.62, and each of the transfers enumerated in paragraph 41 above was made after that date. Accordingly, the additional amounts in Account 70026 were largely made from the Settlers Reserve Fund deposited in the account on April 12, 1999. The proceeds of the transfers set forth in paragraph

41 are currently the subject of a civil forfeiture pending before Judge Burns in the United States District Court for the District of Connecticut in an action entitled United States v. $11,014,165.20, Civil No. 3:99CV02589(EBB).

(c)    **$10 Million in Diamonds are Traceable to the Settlers Reserve Fund**

43.    On or about May 3, 1999, Frankel bought $10 million worth of diamonds from World Wide Diamonds in Los Angeles via a wire transfer of $9,999,985 from the account at Banque SCS Alliance.

44.    On information and belief, Frankel had approximately $8 million in diamonds in his possession when he was apprehended by the German authorities on September 4, 1999. On information and belief, these diamonds are currently being held by the German authorities awaiting return to the United States.

45.    On information and belief, on or about May 4, 1999, one of Frankel's accomplices, David Rosse, stole an unknown number of diamonds purchased by Frankel with a portion of the Settlers Reserve Fund that were en route to Frankel. As part of a guilty plea, Rosse turned over some but not all of these diamonds to the United States government.

46.    As set forth above, the Settlers Reserve Fund constituted the overwhelming majority of the funds in Account 70026 on May 3, 1999. The funds used to purchase the $10 million in diamonds could only have come from the Settlers Reserve Fund.